12-1038, Julie A. Pucci v. Chief Judge Mark W. Somers. Arguments not to exceed 15 minutes per side. Ms. Miller for the appellant. Good afternoon, Your Honors. I would like to reserve three minutes for rebuttal, please. Assistant Attorney General Jean Marie Miller on behalf of the defendant, Appellant Judge Somers. I know this panel is familiar with this case because this case has been presented to this panel once before, so I'm not going to dwell on the facts. But there are three issues that were addressed in the brief that I'm going to focus on this afternoon. The first is that the District Court erred as a matter of law when it denied Judge Somers' Rule 50 motion with regard to Ms. Pucci's free speech claim because her speech simply was not protected. She was not speaking as a private citizen, but was speaking pursuant to her public duties. The second issue is that the District Court erred as a matter of law when it denied Judge Somers' Rule 50 motion in finding that the plaintiff's interest in her speech outweighed the court's interest in promoting efficiency that would be addressing the District Court's Pickering balancing test. And lastly, that the District Court erred as a matter of law when it found that Judge Somers had waived a defense of the court reorganization, and that waiver, the court's determination that Judge Somers had waived that defense affected the presentation and the jury instructions given to the jury as it related to the due process argument. And further, that because the court held that the reorganization defense was waived, plaintiff's, or defendant was not allowed to argue that due process wasn't required in this case because of there being a reorganization. The court simply would not consider that issue. With regard to the First Amendment argument, in this case, it's clear from the facts. First of all, I want to state, at the point in time when we got to trial, there was no dispute about what the statements were. And this court in Westmoreland v. Sutherland held that whether or not speech is protected is a question of law when there is no dispute about what the speech was. At trial, and here today, there is no dispute about what the speech was. So it was a question of law. I point that out because earlier this court, in determining whether or not qualified immunity existed in the prior appeal, held that that issue was a question of fact as to whether she was speaking as a private citizen or a public citizen, and that it was a question of fact that had to be presented to the jury. The court didn't affirmatively state, as plaintiffs would have this court believe, that she was speaking as a public citizen. They said it was a question of fact for the jury to be determined. Well, when we got to trial, evidence was presented. There was no evidence offered to contradict what the statements were. And under Westmoreland, that became a question of law. Here, it's clear. Under Garcetti, and under the precedent of this circuit in the Fox v. Traverse City Public Schools case, the Haney case, and the Wise Birth v. Giada Lake case, Ms. Pucci was speaking, the complaints that she made regarding the religiosity of Judge Summers, she was clearly making in the context of her job duties. She was the court administrator or the deputy court administrator. One of her job duties was to interface with SCALE. This was the body that's the Supreme Court Administrator's Office. That was the body that she made her complaints to. Now, at trial, Ms. Pucci was only able to recall two specific complaints that she made. She believes, as she discussed at other times, but she was only able to specifically remember two. One, she instigated and called up and made a complaint, not just to a random person at SCALE, but her contact, the contact that she as the court administrator would go to within the Michigan court system, Jan Hunt Cost, the regional administrator, to address these types of issues. And the evidence was clear from Judge Foran, who was the prior chief judge of the court, from Jan Hunt Cost, and from Ms. Pucci herself, that these types of issues were routinely addressed with the court. If she had an issue with the court as the court administrator and the efficient operation of the court, it was her duty to address it with SCALE. And Ms. Pucci testified. She brought it up kind of. I mean, she wasn't supposed to make, as a part of her duties, complaints about judges to the administrative office. I mean, where would that be found in her assigned duties? Well, actually, the fact that that was part of her assigned duties, Jan Hunt Cost testified that when they wanted to determine who would be best appropriate to be the chief judge, this was Ms. Pucci's second complaint about this issue, she specifically asked, in this system, the regional administrator would go to the court administrator and say, we're looking at naming a chief judge. How do you think this person would be? Do you think he would make a good judge? It was in that context that she said, no, because of these religiosity issues. It affected the operation of the court and the services that the court were delivering, and it was part of what she had to do. And there was no evidence to dispute that presented at court. She testified that she would routinely contact them. And Jan Hunt Cost testified. I contacted her when I wanted to know about who would be the best chief judge. Well, all the remarks, the complaints that Ms. Pucci made, were not in the context of someone asking her a question about which judge was best suited to be chief judge. You don't make that representation in court, do you? No. She testified to two specific instances, one that she could recall, one where someone brought a quote on a letterhead to her attention and she brought it up to the SCAO, and the second was when Jan Hunt Cost asked her. But I brought up the Jan Hunt Cost questioning her to show that is the sort of things that SCAO would rely on the court administrators to determine. Who is the best functioning judge to serve in this position? That's the type of information SCAO wanted from its court administrators. If SCAO didn't expect its court administrators to provide those sorts of information, Jan Hunt Cost wouldn't have asked her. She would have simply relied upon the judges, but they rely on the court administrator. That was a part of her duties. That would be the most unusual court setting I have ever heard of because judges don't ordinarily organize the court's administrative functions so that the top administrators of the court spend their life calling the administrator or calling a higher court or calling whomever to complain about the judges. That would be a very unusual court administrative structure. Well, Jan Hunt Cost testified that is what they did, and she testified Ms. Pucci wasn't the only one who brought these sorts of sensitive issues to her, that it was routine to get calls from court administrators, and that was how she functioned with her court administrators. And it was in that context that Ms. Pucci went to Jan Hunt Cost because she said, I wanted SCAO to investigate this. Would it be different if she made the complaint to the Judicial Tenure Commission? I think it would be different because she didn't have that interface of give-and-take relationship with the Judicial Tenure Commission. She had that with SCAO, and she went to the person SCAO designated for her to deal with on court issues. So I do think it would be different if she went to the JTC, but the fact that she went to the SCAO-appointed person for this, and the SCAO-appointed person, in fact, sought her out for this issue, I think is important to the fact that she's not speaking as a private citizen but speaking pursuant to her public duties. That doesn't end the inquiry, though, because even if this court were to determine Are you suggesting she has a public duty to answer the question about whether Judge Summers would be a good chief judge or not? Jan Hunt Cost asked her opinion, and this is her supervisor. Does Ms. Pucci have a duty to answer the question? I think when SCAO is requesting information from her as the court administrator regarding the selection of the chief judge, I do think she has an obligation to provide that information. But that does not end the inquiry here, because even if it's determined that she's speaking as a private citizen on a matter of public concern, the court then has to apply the Pickering balancing test. And in this case, we have some guidance from the jury, because a specific interrogatory was asked of the jury, Did Ms. Pucci's complaints, comments, cause, or could they have caused disharmony in the workplace? And, in effect, in the court workplace? And the jury said yes. And the district court disregarded that in making the Pickering balancing test. The court disregarded it and said, and focused not on the operation of the court, which is the appropriate function, which is the appropriate inquiry in a Pickering balancing test, but the court said, Well, there was already problems and disharmony among the judges. And the court focused solely on looking at the interpersonal relationships between court personnel and not the efficient operation of the court. And the court administrator is the highest non-lawyer, non-licensed lawyer working in the court and has to have a good working relationship with the chief judge. And the jury found in their interrogatory that disharmony could have been caused. And I think that is outcome determinative on the Pickering balancing test. With regard to the due process claim, the court refused to allow Judge Summers to present a defense that the reorganization of the court affected the amount and type of due process that was to be allowed or be required. The court found that because Judge Summers had not raised that issue in a motion for summary disposition, that somehow he had waived that defense. The reorganization defense would not be an affirmative defense that would be eligible to be waived. And Judge Summers was not required to raise every legal issue in a motion for summary disposition in order to preserve it for trial. There are lots of strategic reasons you don't raise certain issues. Maybe we believe there could have been a question of fact. And so the judge determining that the issue was waived was improper. And by the judge determining that that issue had been waived, it impaired the presentation of the issue to the jury because the jury was not allowed to answer the question whether or not the reorganization was a sham, and if it was, what the due process was that was required in this situation. Here simply, she did get due process. She admitted she was notified in advance of what was going to happen, that she had time to sit down with Judge Summers, and she also claimed to be a member of the civil service and had post-termination due process rights as well that she chose not to avail herself of. Thank you, counsel. Good afternoon, Your Honors. I'm Judge Joel Splier on behalf of Ms. Pucci. I've had the absolute pleasure and honor of representing Ms. Pucci for almost eight years now. I was the counsel here at the Interlocutory Appeal a few years ago. I tried the case, obtained a verdict, and I'm here again today, and it's a pleasure to be here. I'm going to respond briefly because my brief, I think, contains responses. But this Court had ruled earlier in the Interlocutory Appeal in the unanimous decision that there was an issue of fact as to whether or not Julie Pucci was speaking out as a citizen on matters of public concern. Ms. Pucci complained to scale, to Judge Forehand, to Judge Holcren and others, about Judge Summers' use of religiosity in the courtroom and his violation of the Establishment Clause. That is not a duty of a deputy court administrator or any administrator. It went far beyond her duties as a court administrator, which is why she was outraged as a citizen. She made those complaints. She voiced those concerns. And she was retaliated for that, and the jury found, following this Court's mandate and this Court's ruling, that they have to resolve that question. They did. They found the fact supported retaliation. They found that Julie Pucci spoke out as a citizen, not as a deputy court administrator, and there's no evidence to support the suggestion that she spoke out otherwise. And they made the proper determination. Judge Lawson gave a full written explication of his Pickering balancing test, and he looked at the Pickering balancing test in light of Sixth Circuit Court precedent, and what we really learned is that Julie Pucci made her complaints the exact way we want our public employees to make complaints. She wasn't berating. She wasn't rude. She wasn't loud. She didn't disrupt the workplace. Whoever disrupted the workplace, if you're going to point a finger, it would be Mark Summers. He had a difficult relationship with Judge Holbrook. He had filed JTC complaints. He had fired Ms. Pucci, who was respected and admired. He hired a gentleman by the name of Gary Dodge, who was remarkably abrasive and difficult, and morale fell for that reason, not because of Julie Pucci's speech. And Judge Lawson, who sat as a trier of fact, made the proper determination and found that Julie Pucci, under the Pickering balancing test, was entitled to her judgment. As to the reorganization claim, if the tactical decision is to waive a defense, well, I guess you've got to live with it. And if that's what their decision was, we're not going to pursue the unpublished decision of upshot, the reorganization exception, because tactically we think there are issues of fact, or tactically we don't want to do so. I don't understand how you bring that here today. Judge Lawson was right. On the 11th hour, you can't raise a new defense that, as a matter of law, I could have determined and this Court could have passed on back in December of 2010. It could have looked at it. The bottom line is this. The centerpiece of the defense at trial was that Judge Summers implemented a legitimate reorganization plan. That was his entire defense. The jury rejected that defense. The jury found that it was a sham, that it wasn't so, that it was simply a vehicle to remove a public employee because she engaged in protected activity under the First Amendment and in his zeal to do so, gave for no due process. Putting a memo in somebody's box that they are fired is not due process. Making a determination months before you tell them they're fired is not due process. As far as the post-termination proceedings go, Julie had none. The city of Dearborn, under Michigan Corral 8.110C3, I believe, cannot tell. Judge Summers, bring her back. We want her as an administrator. They have no power to do so. The Attorney General, the attorney for Mark Summers, will not tell you that they do. So I think this appeal is hollow. Are there any cases that say that you waive a defense by not raising it at summary judgment? There are, and I put those in my brief. I can't recount them, but I have noted them in my brief, that if you do not raise the issues timely, and Judge Lawson found that they did not, they did not raise them in a motion for a summary judgment. He found that they did not raise them properly before trial, and therefore they were waived and forfeited, and he provided his reasons for that. But even assuming that they raised it, the whole idea that somehow the reorganization was going to justify the termination, the jury rejected it. It was a pretext under any circumstance. They didn't get any pretext instructions, did they? I thought that, I don't think they had pretext instructions. I do believe that the argument was made, because I was there. But the instructions from Judge Lawson, he never uttered the word reorganization, did he? I don't know. Your Honor, I can't tell you that. I don't think he did. Okay. I don't think he did. Right. But there is case law. So assuming that Judge Lawson was in error, that the defense was waived, hypothetically for purposes of my question, what impact does that have on the case? I think ultimately it had no impact. And I'll explain exactly why. Judge Summers, in order to show that his motivation was not retaliatory, and Judge Lawson actually made this ruling. He allowed them to argue that Judge Summers had implemented reorganization out of proper motives. That argument was made by the defense. But if the argument is made and there are no instructions on that point, how is that fair? Because then the jury can determine that the motivation was not retaliatory. How can the jury determine whether reorganization is an appropriate defense or not, if they're not told one way or the other? Well, because in the context of the trial, that was the entire dispute. Well, I appreciate the fact that there was a lot of evidence in the case regarding reorganization. But if the judge doesn't address reorganization in the instructions, isn't that problematic? I don't think it is. One, because I don't think the defense applies. I don't think they can avail themselves of it. Secondly, the entire. . . Why? Because he waived it. Absolutely they waived it. I mean, there's no question that he waived it, and the law supports that. But I don't think it's problematic at all because that is the exact argument that was made. I think what I hear you saying, and what I would characterize as a better way to express that. Thank you. Is that the reorganization, whether that was the causal factor, that goes to causation. And it will probably, under those circumstances, not necessary to give a specific instruction about reorganization. When reorganization is the cause that was asserted by the defendant, the defendant, whether he waived some sort of a reorganization exception defense, he nevertheless got to explore that issue fully with the jury. Absolutely. It wouldn't have been relevant to the due process claim. Correct. Because reorganizations wouldn't affect whether or not an employee was entitled to due process. It would only go to the First Amendment claim. Correct. And the issue it would go to was causation. Correct. And so I guess what the defendant lost, if I'm understanding this correctly, was perhaps an opportunity for a jury instruction or an opportunity for some different way of describing what happened or a ruling as a matter of law that would take the case out of the jury. Right. Out of the jury's purview. So I'm not sure what was lost to the defendant, and perhaps it's more appropriate for your adversary to address that. Because our position is nothing was lost. That was the entire beef, essentially. That was the entire issue. But did I get what you were saying correctly? Yeah. No, you're absolutely correct, and you phrased it far better than I ever could. But that's absolutely correct because that went to the very issue of, hey, I didn't fire because she spoke out. I fired because I reorganized the court. And the jury doubtless was instructed about causation. Absolutely. Because they couldn't have ruled in her favor on the First Amendment issue had they not determined that that was the reason she was fired. That's exactly my point. And the jury flatly rejected that. And we know that just by their verdict, but also, I think, by the punitives as well, quite frankly. The jury just flatly rejected any explanation that Judge Summers could come up with, especially that one. So does the court have any more questions? I'll be happy to sit down. Okay. Thank you so much. I appreciate your time. I'll address that last point first. The reorganization issue does go to the due process claim because, as we argued in our brief and as this court found in unpublished decisions, but other circuits have found in published decisions, when the issue is reorganization, it affects whether due process is required at all and the level of due process. So it goes to the very heart of due process. In the Upshaw case, the court said due process, if the whole reason for due process is if someone's being fired for performance reasons, that they can address those before that decision is made. When you have a reorganization defense, that's not an issue. And Upshaw, the Sixth Circuit in the unpublished decision of Upshaw, and the other cases that I cited in the brief from other circuits, I believe there's one from the Seventh Circuit, where they have said the level and, in fact, the right to due process becomes an issue when reorganization is an issue because the things the due process seeks to protect are not at issue. There's no stigmatizing negative information being put out there about the plaintiff. It's interesting that in this appeal, Ms. Pucci and her attorney just argued that she was not entitled to. If the jury rejected the fact that reorganization was the motive, then to the extent the jury was determining what process was due, it would necessarily have rejected the reorganization exception, wouldn't it? We don't know that. You're absolutely right. Causation does perhaps go to both the due process claim and the First Amendment claim. But if you can't convince the jury of the correctness of the reorganization defense, you don't even get to the point you're arguing. We don't know because we were not allowed to give the jury instructions on that defense and ask a specific interrogatory like we were with the Pickering. There's no way that Ms. Pucci could have prevailed on the First Amendment claim without the rejection of the reorganization theory. If the court had allowed ñ I don't know what the jury decided because the court wouldn't allow that to be argued as a defense with instructions like he did with Pickering with the specific interrogatories. We just don't know because he didn't allow it. I would also like one final point. The plaintiff wants to argue that she wasn't entitled to post-termination due process because she wasn't subjected to the civil service rules and regulations, but those are the very civil service rules and regulations she relied on to establish her property interest. So she wants to have her cake and eat it too. If they can create a property interest, she's entitled to the post-deprivation procedures too, which would mean she did have the opportunity for due process. Is there a congruence between the proofs necessary for the plaintiff to prove for her First Amendment claim and a properly given instruction regarding reorganization? In other words, what I'm asking is does it necessarily follow what Judge Gibbons is asserting regarding the fact that implicitly, when they found for the plaintiff on the First Amendment claim, they totally rejected the notion that reorganization was a factor. I wish I could answer that question because not having had the jury be instructed on that issue and get the specific interrogatory, I don't know. There's an argument that could be made that it is, but we just don't know because the court prohibited us from presenting that defense simply because we didn't file a summary disposition motion on it. Can I ask, can you refresh my memory, where we find exactly what the district court said about the waiver issue? Yes. Just where in the record is that? It is in the motion in limine transcript. It was the plaintiff's motion in limine, the plaintiff filed the motion in limine, and it was in the context of that motion in limine that the court said, no, you waived it. Did you mention it in a response? We did mention it in a response. So a motion in limine. To their motion in limine. The court in its ruling said it's waived or it's untimely or something to that effect. Correct, and then we filed a motion for reconsideration specifically addressing the waiver issue because the first time it came up was in the oral argument and the court denied our motion for reconsideration as well. So it was in the hearing on the plaintiff's motion in limine and then in response to our motion for reconsideration. In the transcript, not a written ruling. I don't believe there was a written ruling on the motion for reconsideration. Written ruling on the motion the first time? I don't believe with either motion. I don't remember seeing one, but I don't know that I specifically looked. I don't recall there being opinions on the motion in limine or the motion for reconsideration. I believe it's in the transcripts, which are part of the record. Thank you. Thank you, counsel. The case will be submitted. Clerk may adjourn.